UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Honeywell International Inc., | |
| *Plaintiff*, | |
| v. | Civil Action No.  5:18-cv-1176 (GLS/TWD) |
| Sunoco (R&M), LLC, Sunoco, Inc., Atlantic Refining & Marketing, LLC, and Sun Pipe Line Company, LLC, | **COMPLAINT** |
| *Defendants*. | |

Honeywell International Inc. ("Honeywell" or "Plaintiff"), by and through undersigned counsel, for its Complaint in this action, alleges the following:

## PRELIMINARY STATEMENT

1.      Honeywell brings this civil action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*., the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, and New York State law, as set forth below, for costs incurred and to be incurred as a result of releases of petroleum and hazardous substances by Sunoco (R&M), LLC, Sunoco, Inc., Atlantic Refining & Marketing, LLC, Sun Pipe Line Company, LLC, and/or their respective predecessors (collectively "Sunoco" or "Defendants") into Onondaga Lake, its tributaries, and onto land areas which drain into Onondaga Lake in Onondaga County, New York.

2.      These releases of petroleum and hazardous substances have caused contamination of sediment and surface water in and around Onondaga Lake, contamination of sediment, soil, and groundwater at state wetland SYW-12, as well as contaminating or otherwise harming fish

and other aquatic life, and have caused conditions in and around the Lake that posed, pose, or may pose a threat of harm to public health and safety.

## JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction over this matter pursuant to sections 113(b) and 113(g)(3) of CERCLA, 42 U.S.C. §§ 9613(b), (g)(3), section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331, 1367.

4.       Venue is appropriate in the Northern District of New York pursuant to 28 U.S.C. § 1391 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened releases of hazardous substances that gave rise to this action occurred or will occur in this district.

## THE PARTIES

5.       Honeywell is a Delaware corporation with its principal place of business at 115 Tabor Road, Morris Plains, New Jersey 07950.

6.       Defendant Sunoco (R&M), LLC, is a Pennsylvania corporation with its principal executive offices at 1735 Market Street, Philadelphia, Pennsylvania 19103.

7.       Defendant Sunoco, Inc., is a Pennsylvania corporation with its principal executive offices at 1735 Market Street, Philadelphia, Pennsylvania 19103.

8.       Defendant Atlantic Refining & Marketing, LLC, is a Delaware corporation with its principal executive offices at 1801 Market Street, Floor 18, Philadelphia, Pennsylvania 19103.

9.       Defendant Sun Pipe Line Company, LLC, is a Texas corporation with its principal executive offices at 3801 Chester Pike, Newtown Square, Pennsylvania 19073.

10.       Sunoco (R&M), LLC, Sunoco, Inc., Atlantic Refining & Marketing, LLC, and Sun Pipe Line Company, LLC, are all related entities with a common parent, Energy Transfer Partners, LP.

2

# FACTS

### *Onondaga Lake*

11.     Onondaga Lake is located in Onondaga County, New York.

12.     Onondaga Lake is a 4.6-square-mile lake, approximately 4.5 miles long and 1 mile wide, with an average water depth of 36 feet and has two deep basins, a northern basin and a southern basin, that have maximum water depths of approximately 62 and 65 feet, respectively.

13.     Onondaga Creek is a tributary of Onondaga Lake.

14.     For over 100 years, Onondaga Lake received discharges and releases of industrial wastes and wastewaters both directly and through its tributaries.

15.     Sediments in Onondaga Lake became contaminated with a variety of petroleum-related and hazardous substances, including those it received through industrial and sewage discharges, as well as surface runoff and contaminated groundwater discharges.

16.     Numerous contaminants discharged into Onondaga Lake, including but not limited to metals, aromatics, chlorinated benzene, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs"), were determined by the U.S. Environmental Protection Agency ("EPA") and the New York State Department of Environmental Conservation ("DEC") to create risk to human and ecological receptors.  These contaminants were present in sediment in Onondaga Lake and are being addressed by remedial actions undertaken by Honeywell.

### *Honeywell's Cleanup of the Onondaga Lake Bottom Subsite*

17.     On June 23, 1989, DEC added Onondaga Lake to the New York State Registry of Inactive Hazardous Waste Disposal Sites.  On December 16, 1994, pursuant to CERCLA, EPA listed Onondaga Lake and certain upland areas on the National Priorities List, thereby designating Onondaga Lake as a Superfund Site.

18.     The Onondaga Lake Bottom has been defined as its own subsite (the "Onondaga Lake Bottom Subsite") and is also referred to as Operable Unit 2, or OU2.

19.     On June 27, 1989, the State of New York commenced a civil action against Honeywell's predecessor Allied-Signal Inc. ("Allied-Signal") in the U.S. District Court for the Northern District of New York under section 107 of CERCLA.  New York v. Honeywell Int'l Inc., No. 3:89-CV-00815-FJS-DEP.  In its suit, the State sought to compel Allied-Signal to investigate and remediate contamination in the sediments of Onondaga Lake and in associated upland areas.

20.     Allied-Signal (and after 1999, Honeywell) undertook a comprehensive Remedial Investigation and Feasibility Study ("RI/FS") of the Onondaga Lake Bottom Subsite under DEC oversight.  The RI/FS was completed in November 2004.

21.     On July 1, 2005, DEC and EPA issued a Record of Decision ("ROD") for the Onondaga Lake Bottom Subsite, which details the selected remedy for the Lake.  Pursuant to the ROD, the selected remedy includes a mixture of sediment dredging, isolation capping, and thin layer capping, as well as certain other measures, including the construction of a sediment consolidation area to contain dredged sediment.  In addition, the ROD requires the implementation of institutional controls and long-term maintenance and monitoring of the remedy.

22.     The ROD estimates the total cost of the selected remedy at $451,000,000.

23.     The ROD-estimated costs do not incorporate inflation.

24.     On January 4, 2007, the U.S. District Court entered a Consent Decree between DEC and Honeywell in which Honeywell agreed to fund and implement the remedy set forth in the ROD ("2007 Consent Decree") (attached hereto as Exhibit 1).

25.     The 2007 Consent Decree provides that "Honeywell shall be deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2) for 'Matters Addressed' pursuant to and in accordance with this Consent Decree . . . Furthermore, to the extent authorized under 42 U.S.C. § 9613 (f)(3)(B) or other provisions of CERCLA, by entering into this judicial settlement of liability for the Matters Addressed herein, Honeywell may seek contribution from any person except those who are entitled to contribution protection under 42 U.S.C. § 9613 (f)(2)."  Ex. 1, ¶ 90.

26.     Honeywell completed the dredging required by the ROD in November 2014, one year ahead of schedule.  2.2 million cubic yards of Lake material were dredged.

27.     In September 2015, EPA concluded that implementation of the remedy was progressing as expected, and noted that several process enhancements and modifications were implemented by Honeywell to improve overall dredge system performance and production capabilities.

28.     Honeywell completed the capping required by the ROD in December 2016.  Four hundred seventy-five acres of the Onondaga Lake Bottom Subsite were capped by Honeywell, with more than 3 million cubic yards of material.

29.     Honeywell completed the habitat enhancements required by the ROD in December 2017.

30.     In total, Honeywell has restored about 90 acres of wetlands and planted about 1.1 million native plants on the Onondaga Lake shore and along its tributaries.

31.     Honeywell is required to perform monitoring and maintenance of the remedy and habitat restoration for years to come.

32.     As a result of Honeywell's cleanup, the quality and utility of Onondaga Lake has dramatically improved.

33.     For example, in October 2014, DEC concluded that water quality conditions in the northern two-thirds of the Lake were, for the first time since 1940 (after 74 years), again suitable for swimming.

34.     Audubon New York presented Honeywell with its annual Thomas W. Keesee, Jr. Conservation Award for the cleanup and restoration of Onondaga Lake.  The award announcement highlighted Honeywell's leadership, the ambitious nature of the project, and celebrated the return of the Lake to the Central New York community as a healthy, sustainable asset for future generations.

35.     Various state and local government officials have expressed gratitude regarding the success of the Onondaga Lake cleanup and Honeywell's willingness to perform it.

36.     For example, Onondaga County Executive Joanie Mahoney stated that "Honeywell's willingness to meet and exceed its obligations is the reason why we're standing here today.  I'm very proud to be partnering with them in this cleanup."

37.     Speaking to the cleanup of Onondaga Lake, former DEC Commissioner Joseph Martens stated that "Honeywell has been one of the most progressive and cooperative responsible parties to tackle such a significant environmental problem."

38.     The U.S. Department of Justice ("DOJ"), in a brief filed on behalf of EPA, stated that "while many companies operated at and near [Onondaga Lake] during the 20th Century, Honeywell alone agreed to take responsibility for performing extensive and expensive cleanup work at the Site."  Memorandum in Support of Unopposed Request to Enter Consent Decree at

11, <u>United States v. Honeywell Int'l Inc.</u>, No. 5:17-cv-01344-FJS-DEP (N.D.N.Y. Feb. 27, 2018), ECF No. 3-1.

### ***Honeywell's Payment of EPA's Past Costs***

39.     On December 14, 2017, DOJ filed a civil action under section 107 of CERCLA seeking recovery from Honeywell of costs incurred by the United States in connection with response actions at the Onondaga Lake Superfund Site.

40.     On the same day, DOJ filed a notice of a proposed consent decree that resolves all Honeywell liability for these response costs.

41.     On April 17, 2018, the U.S. District Court for the Northern District of New York entered the consent decree ("2018 Response Costs Consent Decree") (attached hereto as Exhibit 2).

42.     The 2018 Response Costs Consent Decree requires Honeywell to pay $7.3 million in reimbursement of response costs incurred by the United States with respect to the Onondaga Lake Superfund Site.

43.     The 2018 Response Costs Consent Decree provides that "[t]he Parties further agree, and by entering this Consent Decree this Court finds, that the Complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which each Settling Party and each Settling Federal Agency has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B)." Ex. 2, ¶ 28.

44.     Honeywell made the payment required pursuant to the 2018 Response Costs Consent Decree on May 7, 2018.

*__Honeywell's Restoration of Natural Resource Damages__*

45.     On December 20, 2017, DOJ filed a civil action under section 107(a) of CERCLA seeking recovery from Honeywell for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, resulting from the releases of hazardous substances at or from facilities at the Onondaga Lake Superfund Site.

46.     On the same day, DOJ filed a notice of a proposed consent decree that resolves these claims under section 107(a) of CERCLA against Honeywell and Onondaga County for natural resource damages ("NRD") resulting from the releases of hazardous substances at or from facilities at the Onondaga Lake Superfund Site.

47.     On March 14, 2018, the U.S. District Court for the Northern District of New York entered the consent decree ("2018 NRD Consent Decree") (attached hereto as Exhibit 3).

48.     The 2018 NRD Consent Decree provides that Honeywell will (1) implement and maintain 20 restoration projects to restore and protect wildlife habitat and water quality, and increase recreational opportunities at Onondaga Lake; (2) pay $5 million for future restoration projects to be undertaken by the Trustees; (3) pay $500,000 toward stewardship activities to protect and maintain restoration projects; and (4) pay $750,000 for Trustees' future oversight costs.

49.     The work and payment obligations under the 2018 NRD Consent Decree are estimated by DOJ to total $26 million.

50.     The 2018 NRD Consent Decree provides that "[t]he Parties further agree, and by entering this Consent Decree this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to

which each Settling Party has resolved liability to the United States for Natural Resource

Damages within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B)."

Ex. 3, ¶ 82.

      51.     Honeywell made the payments required under the 2018 NRD Consent Decree on

April 10, 2018.

### *Honeywell's Investigation of SYW-12*

      52.     The SYW-12 property is located at the southern end of Onondaga Lake along the

northeastern shoreline of the Lake.

      53.     The SYW-12 property is bounded by railroad tracks and the former Oil City area

to the east, a barge canal to the south, and the Lake to the west.

      54.     The area is currently approximately 40.7 acres but has expanded and contracted

over time based on Lake depth and deposition of fill material.

      55.     The area is currently owned by Onondaga County.

      56.     Neither Honeywell nor its predecessors operated at SYW-12.

      57.     Nonetheless, Honeywell began investigation at the SYW-12 property in 2006.

      58.     Neither EPA nor DEC has ever formally concluded that Honeywell is a

responsible party at SYW-12.

      59.     No administrative or judicial settlement or order explicitly resolves any

Honeywell liability for SYW-12.

      60.     Honeywell has incurred and anticipates incurring significant costs in the

investigation of contamination at SYW-12.

### *The Oil City Area*

61.     Oil City refers generally to a former industrial area in the City of Syracuse located north of the downtown business area.  The area is bounded by railroad tracks to the northeast, a barge canal to the southeast, and an interstate highway to the northwest.

62.     The Lake is located to the west of Oil City and is separated from Oil City by railroad tracks and SYW-12.

63.     The location of Oil City in relation to the Lake, the areas of the Onondaga Lake Bottom Subsite that were subject to dredging and/or capping, and SYW-12 are shown below:



64.     Oil City is comprised of multiple separate tax parcels formerly owned by Sunoco and several other oil companies.

65.     The Oil City area was used as a bulk petroleum storage and distribution facility by Sunoco and other oil companies from approximately the 1910s through the 1990s.

66.     Much of the former Oil City area was redeveloped over the course of the 1990s and early 2000s.  The area is now home to the Destiny USA shopping and entertainment center, which opened in 1990 as the Carousel Center mall, and an Embassy Suites by Hilton hotel, which opened in 2017.

### *The Barge Canal*

67.     Prior to 1918, goods were shipped to and from Syracuse via the historic Erie Canal, which ran through the center of Syracuse at the southeast end of Onondaga Lake.

68.     In the early 1900s, construction began on the New York State Barge Canal ("Barge Canal").

69.     As part of Barge Canal construction, the old Erie Canal was rerouted so that the newly constructed barge route passed by the northwestern end of Onondaga Lake.

70.     In order for goods to continue to be delivered to Syracuse by barge, the new route passed through Onondaga Lake to a newly constructed spur and terminal at the southeastern end of the Lake (the "Syracuse Terminal").

71.     The Syracuse Terminal was located directly adjacent to the southeast corner of Oil City.

72.     Construction of the Barge Canal in the Oil City area began around 1918.

73.     The Onondaga Creek channel, which historically flowed through the Oil City area, was diverted to connect to the Syracuse Terminal and was straightened and widened to allow for barge traffic.

74.     The completed Barge Canal forms the southeastern boundary of the Oil City area and connects the Syracuse Terminal and the Oil City area to the Erie Canal segment of the Barge Canal via Onondaga Lake.

75.    The Barge Canal facilitated shipment of petroleum products to and from the Oil City area via barge through at least the mid-1980s.

76.    Groundwater beneath Oil City flows towards the Barge Canal.

77.    The Barge Canal flows into Onondaga Lake.

### *Oil City Operations*

78.    Historically, the Oil City area was broken into various oil terminals, some of which were owned by Sunoco at various times.  The following is a map of Sunoco's terminals and pipelines:



79.    The Oil City companies, including Sunoco, arranged for transport and/or transported petroleum products and hazardous substances to and from Oil City by barge, pipeline, train, and truck.

80.     A number of the Oil City companies, including Sunoco, owned and operated tank barges and/or tugboats that transported petroleum products to and from Oil City.

81.     The Oil City companies, including Sunoco, also arranged for the transport of petroleum product via barges owned or operated by other companies to and from Oil City.

82.     A number of the Oil City companies, including Sunoco, constructed docks along the Barge Canal to facilitate shipping of petroleum products to and from their Oil City facilities.

83.     A number of the Oil City companies, including Sunoco, also constructed temporary pipelines for use in transferring petroleum products between barges and the storage tanks at Oil City.

84.     Barge transport of petroleum products to and from Oil City and arranged for by the Oil City companies, including Sunoco, was dominated by heavier petroleum products, namely number 4 and number 6 fuel oils.

85.     In some years, 100% of the petroleum products transported to and from Oil City via barge were the heavier number 4 and number 6 fuel oils.

86.     Three major petroleum pipelines, including one owned by Sunoco, also transported petroleum products to Oil City.

87.     Petroleum products transported to Oil City via pipeline included gasoline as well as heavier petroleum products such as diesel and fuel oils.

88.     Petroleum products, wastes, and other hazardous substances were stored at Oil City in aboveground and underground storage tanks.

89.     Stored products were loaded or pumped onto trucks by the Oil City companies, including Sunoco, for delivery throughout the Onondaga Lake basin.

### *Spills, Leaks, and Other Releases Inherent to Oil City Operations*

90.     Spills and leaks were inherent to operations at Oil City.

91.     Spills and leaks of petroleum products and hazardous substances occurred regularly through many activities at Oil City, including but not limited to the following:

    a.  Overfilling tanks, tank trucks, tank cars, barges, and tankers resulting in spills of the various products stored at Oil City;

    b.  Ruptures in tanks/corrosion of tank bottoms resulting in spills of product contaminated with rust, metals, and other hazardous substances;

    c.  Leaks in pipe and valve fittings at pipelines, tanks, and barges;

    d.  Spills from tank bottom cleanout and tank bottom sludge, and oil/water separator sludge disposal;

    e.  Spills from line flushing and pipe/tank changes;

    f.  Leaks from aboveground and underground storage tanks;

    g.  Spills and leaks of solvents used to clean equipment; and

    h.  Pipe damage by collision with equipment.

92.     Intentional releases of hazardous substances also occurred in the ordinary course business through the following activities:

    a.  Releases of contaminated water from oil/water separators into the Barge Canal; and

    b.  Upon information and belief, barge ballast water dumping.

93.     Before the 1970s, spills and leaks of petroleum products and hazardous substances were rarely documented or reported.

94.     Prior to 1970, to the extent that spilled or leaked petroleum products were considered a safety concern at all, they were concerning only because they created a risk of fires or explosions and not because they posed a risk to human health or the environment.

14

95.     It was not until the 1970s and 1980s that the full environmental consequences of petroleum and hazardous substance spills and leaks became widely understood and regularly documented.

96.     Specific reports and examples of Sunoco's spills and leaks are discussed below. However, as a result of improvements in reporting over time, upon information and belief, far more spills, leaks, and other releases of petroleum and hazardous substances occurred at Sunoco's Oil City facilities prior to the 1970s and went largely or entirely undocumented.

97.     As early as 1916, national petroleum industry trade literature was reporting on the average rates of loss incidental to petroleum storage operation and estimates ranged from 2% to 5% of total throughput.

98.     A 1918 report found that aboveground storage tanks, like those at Oil City, had an average leakage rate of 0.5% and estimated that leakage accounted for, on average, 40% of the loss resulting from evaporation and leakage combined.

99.     A 1928 newspaper article noted that many of the tanks at Oil City were built on extremely soft ground, and pipe connections to the tanks were likely to rupture as the tanks settled into the earth.

100.     In just four years, from 1987 to 1991, there were at least 47 reported spills at Oil City.

101.     Thirty-two spills were reported at Oil City in 1990 alone, suggesting that many spills went unreported prior to 1990.

102.     In 1996, EPA determined that at least 20% of the aboveground storage tanks older than 20 years at Oil City had corrosion failure and that most of the aboveground storage tanks at Oil City were over 20 years old.

103.    In addition to the spills and leaks relating to storage of petroleum products on Oil City parcels, spills and leaks occurred during the transport of petroleum products to and from Oil City, during the transfer of petroleum products to and from pipelines within the terminal areas, during the transfer of petroleum products to and from trucks in the terminal loading areas, during the transfer of petroleum products to and from barges, and from the barges during transport through the Barge Canal and across Onondaga Lake.

104.    In 1928 it was reported that gasoline leaked from a barge that was unloading at Oil City.  The gasoline covered the surface of the Barge Canal and resulted in a "spectacular" fire.

105.    As early as 1946, the New York State Department of Health recognized Oil City barge transfer operations in the Barge Canal as an important source of potential pollution and found that as a result of the Oil City operations, large amounts of oil and grease accumulated at the Barge Canal.

106.    In 1947, the New York State Department of Health identified discharges of billage and ballast waters from oil barges as one of the major sources of troublesome black oil soot and miscellaneous debris in Onondaga Lake.

107.    A 1971 study of oil pollution in New York State found that ruptured hose lines, negligent operation of valves and shut-offs, and overpumping often occurred during ship-to-shore or shore-to-ship transfers of petroleum products, like those occurring at Oil City.

### ***Defendant Sunoco's Operations***

108.    Sunoco owned and operated a series of major onshore petroleum storage facilities in Syracuse from 1919 to 1993.

109.    The first facility was located at the corner of Turtle and Sunset streets ("Sunset Street Terminal") and was in operation from 1919 to 1928.

110. The Sun Oil Company owned and operated the Sunset Street Terminal from 1919 to 1928.

111. The Sunset Street Terminal was located just north of Oil City.

112. Sunoco, Inc. (R&M) is a successor-by-merger to the Sun Oil Company.

113. In 2016, Sunoco, Inc. (R&M) changed its name to Sunoco (R&M), LLC. Defendant Sunoco (R&M), LLC is a mere continuation of and/or successor to Sunoco, Inc. (R&M).

114. The Sunset Street Terminal had at least ten separate storage tanks with a capacity of between 100,000 and 210,000 gallons.

115. The Sunset Street Terminal was destroyed in July 1928 by a massive explosion and fires that caused surrounding buildings to catch fire.

116. Two weeks after the Sunset Street Terminal explosions and fire, an unknown amount of petroleum product that was found running in a stream across the land and into the Barge Canal, which officials attributed to gasoline being released from tanks at the Sunset Street Terminal in order to avert further explosions. This stream caught fire, resulting in at least a 36-hour blaze in the Oil City area and on the Barge Canal.

117. Following the destruction of the Sunset Street Terminal through fire, Sun Oil Company constructed a new terminal closer to the Barge Canal known as the Sun Marketing Terminal ("Sun Terminal").

118. Sunoco owned and operated the Sun Terminal from 1928 until 2002.

119. The Sun Terminal is located in Oil City on West Hiawatha Boulevard between Solar Street and Interstate 81.

120.   Beginning in 1985, Sunoco and/or Atlantic Refining & Marketing Corporation also owned and operated a major onshore petroleum storage facility known as the Sun/Atlantic Terminal ("Sun/Atlantic Terminal"), located at Oil City adjacent to the Sun Terminal between Solar Street and Interstate 81.

121.   In 1988, the Sun Company, Inc. acquired the Atlantic Refining & Marketing Corporation.

122.   In a 2000 agreement with DEC, Sunoco, Inc. (R&M) admitted to owning and operating the Sun/Atlantic Terminal.

123.   In 2018, Atlantic Refining & Marketing Corporation changed its name to Atlantic Refining & Marketing, LLC.  Defendant Atlantic Refining & Marketing, LLC, is a mere continuation of and/or successor to the Atlantic Refining & Marketing Corporation.

124.   The Sun/Atlantic Terminal had at least eight aboveground storage tanks with a capacity of over 7.5 million gallons of product.

125.   Sunoco owned, operated, and/or arranged for the transport of oil, gasoline, and other petroleum products to and from the Sun Terminal, the Sun/Atlantic Terminal, and the Sunset Street Terminal via various means, including via barge.

126.   Sunoco owned at least two barges, named the Cayuga Sun and the Seneca Sun, that were used to transport oil, gasoline, and other petroleum products to Oil City.

127.   Sunoco also owned and operated aboveground and underground pipelines within the boundaries of the Sun and Sun/Atlantic Terminals.

128.   Piping on the Sun Terminal was constructed in the 1930s.

129.    In 1931, Sun Pipe Line, Inc. installed an interstate pipeline for the transmission of petroleum products from the Sun Oil Company refinery in Marcus Hook, Pennsylvania, to the Sun Terminal in Oil City ("Sun Pipe Line").

130.    In 1947, Sun Pipe Line, Inc. merged into the Susquehanna Pipe Line Company.

131.    Upon information and belief, the Susquehanna Pipe Line Company assumed all operations, assets, and liabilities of its predecessor, including ownership and operation of the Sun Pipe Line.

132.    On February 7, 1952, the Susquehanna Pipe Line Company changed its name to the Sun Pipe Line Company.  Sun Pipe Line Company was a mere continuation of and/or successor to Susquehanna Pipe Line Company.

133.    On February 5, 2018, the Sun Pipe Line Company changed its name to Sun Pipe Line Company, LLC.  Defendant Sun Pipe Line Company, LLC, is a mere continuation of and/or successor to Sun Pipe Line Company.

134.    From 1931 until at least 1950, the Sun Pipe Line extended from the southwest shore of Onondaga Lake through Onondaga Lake in an area referred to as "under-water land" before terminating at Oil City.

135.    Upon information and belief, the Sun Pipe Line was later moved to a new location around the southern shore of Onondaga Lake.

136.    Upon information and belief, the Sun Pipe Line was the source of direct discharges to Onondaga Lake during the period in which it was located in the Lake.

137.    As of 1986, the Sun Pipe Line had a capacity of 16 million barrels per day.

138.    The Sun, Sun/Atlantic, and, upon information and belief, the Sunset Street Terminals all stored various octane grades of gasoline, diesel fuel, lubricating oil, and hazardous substances.

139.    Storage tanks (both aboveground and underground) and pipelines at the Sun, Sun/Atlantic, and Sunset Street Terminals often leaked petroleum, kerosene, diesel, gasoline, waste oil, and hazardous substances into the soil.

140.    Sunoco did not install or operate sufficient tank field liners at the Sun/Atlantic Terminal until at least 1991.

141.    Upon information and belief, sufficient tank field liners were also not present at either the Sun Terminal or the Sunset Street Terminal.

142.    In 1954, the Sun Pipe Line leaked an indeterminate amount of gasoline.

143.    In 1965, the Syracuse fire department was dispatched to the Sun Terminal and located a leak in the Sun Pipe Line underground.

144.    In 1973, the fire department was called to the Sun Terminal when a utility crew digging a new man hole for the sewer struck gas, oil, and kerosene.

145.    In 1981, a break in the Sun Pipe Line resulted in a release of No. 2 fuel oil at the Sun Terminal.

146.    In 1985 and 1986 (and upon information and belief in other years as well), leaks of unknown amounts of fuel both from the Sun Pipe Line and at the Sun Terminal occurred.

147.    In 1989, DEC discovered free petroleum product in the groundwater around a water main adjacent to the Sun Terminal.

148.   In 1992, multiple underground storage tanks at the Sun Terminal failed tightness testing during facility closure, including a 10,000-gallon tank used to store gasoline additives, a 1,000-gallon tank used to store heating oil, and a 500-gallon tank used to store garage waste oil.

149.   Sunoco acknowledged that these leaking underground storage tanks resulted in the contamination of soil with hazardous substances.

150.   In addition to leaks, there were frequent spills at the Sun and Sun/Atlantic Terminals, and, upon information and belief, at the Sunset Street Terminal.

151.   In addition to petroleum product spills, documented hazardous substance spills at the Sun and Sun/Atlantic Terminals include spills of "slop" and tank-bottom sludge.

152.   Upon information and belief, in addition to the spills and leaks described above, myriad additional spills and leaks of petroleum and hazardous substances occurred at Sunoco's Oil City facilities.

153.   In addition to spills and leaks of petroleum products and hazardous substances, Sunoco also generated significant quantities of hazardous wastes.

154.   Storm water from the properties, including from the truck loading rack areas and tank fields at both the Sun and Sun/Atlantic Terminals, was directed to oil/water separators that generated sludge containing hazardous substances, waste water contaminated with hazardous substances, and other hazardous wastes.

155.   The effluent from the oil/water separators, which contained hazardous substances, was conveyed to drainage ditches or storm sewers, which discharged to Onondaga Creek/Barge Canal.

156.    Upon information and belief, oil/water separators were not present for the entire operational history of the Sunoco facilities, and historically storm water was discharged untreated into the Barge Canal.

157.    Upon information and belief, even once they were installed, the oil/water separators at the Sunoco facilities did not always work properly, would become clogged with debris, were not always sufficient to handle the capacity of waste water being discharged, and/or otherwise resulted in a bypass of any pre-treatment before discharge into the Barge Canal.

158.    Sometime during or after 1972, Sunoco obtained New York State Pollutant Discharge Elimination System ("SPDES") permits.

159.    As late as 1991, Sunoco indicated to DEC that it had periodic difficulty in meeting action limits set by its SPDES permit at least at the Sun/Atlantic Terminal.

160.    Sunoco's documented SPDES permit violations included effluent limitation exceedances for benzene, toluene, ethylbenzene, and xylene ("BTEX"), PAHs, and oil and grease.

161.    In attempting to correct these exceedances, Sunoco implemented secondary treatment but failed to properly monitor discharges from the new treatment system.

162.    After 1985, according to Sunoco, "all hazardous wastes, hazardous substances and industrial wastes generated, handled, treated or stored at the facilities, including tank bottoms and separator sludge . . . [were] transported and disposed of in compliance with government regulations at approved and permitted disposal facilities."

163.    However, prior to 1985, upon information and belief at least a portion of the hazardous wastes, hazardous substances, and industrial wastes generated, handled, treated, or

stored at the Sunoco Oil City facilities, including tank bottoms and separator sludge, were disposed of or released on or near Oil City.

164.    As a result of these spills, leaks, discharges, and releases, the Sun and Sun/Atlantic Terminals were and are extensively contaminated with petroleum products and hazardous substances.

165.    Significant portions of the contaminated soil on the Sunoco Oil City properties required excavation and injections of air and/or ozone to encourage natural biodegradation of the organic contaminants.

166.    In addition to petroleum-related materials, one of the Sun Terminal parcels also contained significant zinc waste contamination.

167.    Quantities of lead unexpectedly discovered at the Sun Terminal were also sufficiently high that removal of lead-impacted soils was required.

168.    Groundwater monitoring at the Sun and Sun/Atlantic Terminals indicated the presence of dissolved gasoline, number 2 fuel oil, and BTEX.

169.    Groundwater at the Sun Terminal was so contaminated that it required remediation through a pump and treat system.

170.    In 2003, even after significant remediation had occurred, DEC indicated that soil contamination at the Sun and Sun/Atlantic Terminals still existed below the groundwater table and that groundwater also exceeded relevant standards.  There were also known areas of free product on the parcels at that time.

171.    Sunoco was not always timely and/or technically defensible in its compliance with remediation-related directives from DEC at the Sun and Sun/Atlantic Terminals.

172.    For example, in 1991, DEC stated that it had experienced significant delays in receiving requested reports from Sun Marketing & Refining Company, the entity undertaking remediation of the Sun/Atlantic Terminal on behalf of Defendants.

173.    Similarly, in 2000, Sunoco's consultants submitted a work plan proposal to DEC that included only one soil boring where at least nineteen were warranted.  DEC considered this to be a unilateral change to a previously approved work plan.

174.    Upon information and belief, environmental contamination at the Sunset Street Terminal property has never been investigated or remediated.

### *Contaminants Associated with Defendant's Oil City Operations*

175.    Sunoco's Oil City petroleum products, operations, and wastes contained a variety of contaminants.

176.    PAHs are one of the most important contaminants potentially resulting from spills and leaks from petroleum storage and transport operations.

177.    Heavier petroleum products persist in the environment because they contain higher molecular weight PAHs.

178.    While all PAHs spilled and/or leaked by Sunoco may be harmful to human health and/or the environment and have likely contributed to Honeywell's need to remediate the Onondaga Lake Bottom Subsite, higher molecular weight PAHs are more persistent in the environment than lighter molecular weight PAHs.

179.    Diesel and number 2 fuel oil are heavier petroleum products than gasoline.

180.    Number 4 fuel oil is heavier than number 2 fuel oil.

181.    Number 6 fuel oil is heavier than number 4 fuel oil.

182.    The Oil City companies, including Sunoco, transported, arranged for transport, and stored large volumes of these heavier PAH-containing petroleum products.

183.     Permit renewal records show that in the 1980s, a total of over 70 million gallons of product at least as heavy as number 2 fuel oil passed through the Oil City area on an annual basis.

184.     From 1918 to 1980, an estimated 900 million gallons of products at least as heavy as number 2 fuel oil passed through the Oil City area.

185.     It is estimated that a significant percentage of the spills and leaks that occurred at Oil City were spills or leaks of the higher molecular weight PAH petroleum products.

186.     When petroleum-related PAHs are burned, for example in a terminal fire like the one that occurred at the Sunset Street Terminal, even heavier PAHs, called pyrogenic PAHs, result.

187.     In addition to PAHs, petroleum products also contain more volatile hazardous substances like BTEX compounds.

188.     Significant quantities of BTEX were located in remediated areas of the Onondaga Lake Bottom near Oil City.

189.     Significant quantities of BTEX were found both in the soil and in the groundwater at Defendants' Oil City properties.

190.     In addition to contaminants spilled or leaked through petroleum products or wastes, the Oil City companies, including Sunoco, also spilled or leaked contaminants contained in non-petroleum-related hazardous substances.

191.     For example, chlorinated volatile organic compounds ("VOCs"), which are not a constituent found in petroleum products but are associated with products like equipment cleaning solvents, have also been found in the soil and/or groundwater at Oil City as well as in the Lake Bottom Subsite.

192.    The chlorinated VOCs found at Oil City include carbon tetrachloride, chlorobenzene, methylene chloride, trichloroethylene ("TCE"), vinyl chloride, 1,3-butadien, 1,4-dichlorobenzene, 1,1-dichloroethane, 1,2-dichloroethane, 1-3-dichloroethene, tetrachloroethylene, and 1,2,4-trichlorobenzene.

193.    DEC has identified at least the following as current or pre-remediation contaminants of concern in the Oil City area: 1,2,4-trimethylbenzene, arsenic, barium, benzene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)flouranthene, benzo(k)flouranthene, butylbenzenes, cadmium, chlorobenzene, chromium, chrysene, copper, dibenz[a,h]anthracene, ethylbenzene, indeno(1,2,3-CD)pyrene, lead, manganese, mercury, methyl tert-butyl ether, naphthalene, n-propylbenzenes, PCB (Aroclor 1260), propylbenzenes, petroleum products, phenanthrene, TCE, trimethylbenzenes, zinc, and xylenes.

### *Pathways from Defendants' Facilities to Onondaga Lake and SYW-12*

194.    Environmental contamination resulting from operations at Sunoco's Oil City facilities made its way to the Lake through various pathways.

195.    Many contaminants from Sunoco's operations at Oil City were directly introduced into Onondaga Lake.

196.    Barges owned, operated, and/or arranged for by Sunoco for the transport of petroleum products to and from Oil City traversed Onondaga Lake on their way to the Barge Canal.

197.    Rather than remaining at the Oil City docks for overnight storage, many of these barges were towed out into Onondaga Lake, resulting in further opportunities for direct discharges into the Lake.

198.    In a single incident in 1939, between 2,000 and 9,000 gallons of gasoline leaked from a compartment on a barge directly into the Lake.

199.    Upon information and belief, barges owned, operated, and/or arranged for by Sunoco spilled and leaked many more gallons of petroleum products and hazardous substances (like ballast water) directly into the Lake.

200.    Contaminants spilled, leaked, or released into sanitary sewers on Sunoco's Oil City properties were transported to the publicly owned treatment plant called Metro.

201.    Metro was located on the southern bank of Onondaga Lake and discharged contamination, including a portion of the contamination it received from Sunoco's Oil City properties, directly into the Lake.

202.    A portion of contaminants spilled or leaked into the subsurface of Sunoco's Oil City properties or elsewhere in the Onondaga Lake basin were transported through groundwater and/or non-aqueous phase liquid directly to the Lake.

203.    Contaminants from Sunoco's Oil City operations were also introduced to the Lake via the Barge Canal.

204.    Floating oil was observed regularly along the Barge Canal throughout Oil City's history.

205.    As early as 1928, the Barge Canal terminal and channel into Onondaga Lake were described as being coated in a layer of explosive gasoline.

206.    A portion of contaminants spilled or leaked into storm sewers on Sunoco's Oil City properties were discharged directly into the Barge Canal.

207.    In 1928, a man was trapped by a gasoline explosion in a sewer tunnel running underneath Hiawatha Street.

208.    In 1966, the New York State Department of Health was so concerned with Oil City's discharges to the Barge Canal that it ordered the hiring of a consultant specifically to study oil pollution resulting from discharges to the sewer system by the Oil City tank farms.

209.    In 1971, there was so much petroleum product and waste accumulated in the sanitary sewers on and around the Oil City properties that explosive conditions existed.

210.    A portion of contaminants spilled or leaked into the subsurface of Sunoco's Oil City properties were transported through groundwater and/or non-aqueous phase liquid to the Barge Canal and then into the Lake.

211.    A portion of Sunoco's contaminants that were discharged to the Barge Canal were transported through the sediments of the Barge Canal into the Lake.

212.    A portion of Sunoco's contaminants that were discharged to the Barge Canal were also dredged from the sediments of the Barge Canal and deposited in the Lake or on SYW-12.

213.    The Barge Canal was dredged on a regular basis throughout Oil City's history.

214.    This dredge material was historically deposited on the SYW-12 area and in Onondaga Lake.

215.    As a result, the contamination Sunoco contributed to Barge Canal sediments were transported from Barge Canal directly to SYW-12 and the Lake.

216.    In the 1940s, dredging of the Barge Canal was necessary every three or four years, and the dredged silt was pumped to a swampy part of the shore of Onondaga Lake near the Barge Canal terminal, presumably SYW-12.

217.    A 1946 New York State Department of Health report acknowledges that dredge material from the Barge Canal was pumped to the shore of the southeast corner of the Lake, where unsightly, black, odorous sludge banks were formed.

218.    The 1946 report includes a map showing the location where this dredge was deposited, and the area is the location of SYW-12.

219.    A 1947 memorandum by the New York State Department of Health found that Onondaga Lake was visibly polluted with foreign material affecting at times over half of the area of the Lake and including oil, grease, soot, debris, and both floating and suspended solids of sewage and industrial origin.  The 1947 memorandum specifically pointed to dredge spoils from the Barge Canal as a source of the Lake pollution.

220.    Within Barge Canal, higher concentrations of PAHs occur at deeper sample intervals (*i.e.*, deeper in the sediments).

221.    Given the hydrodynamics and environment of the Barge Canal, impacts that occurred earlier in time are more likely to be present in deeper sediments.

222.    The existence of higher PAH concentrations in the deeper sediments of Barge Canal confirms that more petroleum-related contamination was contributed earlier in the history of Barge Canal (*i.e.*, during the height of Oil City's operations).

223.    The concentrations of PAHs at the deeper sample intervals within Barge Canal are higher than the pre-dredge concentrations of PAHs in the Onondaga Lake Bottom Subsite.

224.    Samples collected by the New York Thruway Authority in 2016 show that to this day, more than 20 years since Oil City operations ceased, the Barge Canal is still heavily contaminated with PAHs.

### *Contamination in the Lake Resulting from Oil City Operations*

225.    Due, in part, to the spills, leaks, discharges, and other releases from Sunoco's Oil City operations discussed above, the Lake became heavily contaminated with petroleum products, petroleum wastes, and other hazardous substances.

226.    By 1966, a Syracuse Post Standard article described "dirty Onondaga Lake" as already "long written off as a lost cause."

227.    A 1990 New York Times article referred to Oil City as "an industrial wasteland of oil tanks, junkyards, toxic dumps, and corroded buildings hugging the shore of Onondaga Lake."

228.    The New York Supreme Court, Onondaga County, in a proceeding related to the redevelopment of Oil City, stated that the Oil City area properties "were eyesores to all who traveled in and through the City of Syracuse for a century and beyond" and "[t]he property today continues to be an eyesore to the general public, a detriment to builders of any type of kind, and has caused significant deterioration in and around the area of the immediate North and Northwest part of the City of Syracuse."  Destiny USA Dev., LLC v. New York State Dep't of Envtl. Conservation, 19 Misc. 3d 1144(A) at 5-6, 867 N.Y.S.2d 16 (N.Y. Sup. Ct. Onondaga Cnty. 2008), aff'd as mod., 63 A.D.3d 1568, 879 N.Y.S.2d 865 (N.Y. Sup. Ct. App. Div. 4th Dep't 2009).

229.    The New York Supreme Court went on to conclude that "[t]he 'Oil City Parcel' is comprised of approximately 14 separate tax parcels formerly owned by major oil companies, including, among others, CITGO, Exxon Mobil, Sun Atlantic, and others.  Petroleum and hazardous substances, including soils contaminated by petroleum, metals, volatile organic compounds, solvent waste, and PCB's [sic] among other contaminants are present throughout the 'Oil City Parcel' as a result of these prior industrial uses and activities."  Id.  It also concluded that "[i]t is undisputed that ground water throughout the 'Oil City Parcel' is also known to be contaminated as a result of these prior industrial uses."  Id.

230.    The New York Supreme Court also acknowledged that "contamination entering the lake from groundwater emanating from [Oil City]" contributed to the pollution of Onondaga Lake. *Id.*

231.    The ROD for the Onondaga Lake Bottom Subsite also specifically identifies Oil City as a contributor of hazardous substances to Onondaga Lake.

232.    Most of the contamination found in the areas of the Lake adjacent to Oil City, Barge Canal, and SYW-12 originated from Oil City operations, including Sunoco's operations.

233.    For example, the ROD concluded that one of the areas with the highest concentration of high molecular weight PAHs was the area off the former Oil City shoreline.

234.    The Onondaga Lake Bottom Subsite remediation area directly adjacent to the Oil City area and SYW-12 and into which Barge Canal discharges is referred to as Sediment Management Unit 6 ("SMU 6").

235.    PAHs are the predominant remedial driver in SMU 6.

236.    PAHs contributed significantly to the need to remediate in 100% of the areas in SMU 6 requiring remediation.

237.    Anthropogenic PAHs in the environment fall into two predominant categories: petrogenic and pyrogenic.

238.    Petrogenic PAH contamination results from petroleum products and petroleum wastes, whereas pyrogenic PAHs result from combustion of materials such as oil, coal, and vegetation.

239.    When compared against petrogenic and pyrogenic signatures, the PAHs present in SMU 6 predominately show a petrogenic, or petroleum-based, signature.

240.     This suggests the PAH contamination in SMU 6 is predominantly a result of petroleum products and wastes leaked or spilled into the environment.

241.     Defendants were major operators within the Oil City area.

242.     Upon information and belief, in addition to contributing petrogenic PAHs, the occurrence of fires at Sunoco's terminals and/or in the Barge Canal also resulted in pyrogenic PAH contributions to the Lake.

243.     The location, concentrations, and forensic composition of PAHs in SMU 6 confirm that Oil City operations, including Sunoco's operations, are the predominant source contributing to the need to remediate that area of the Lake.

244.     Defendants' contamination also contributed to the need to remediate other areas of the Onondaga Lake Bottom Subsite.

**_Contamination in SYW-12 Resulting from Oil City Operations_**

245.     In 1946, dredged material from the Barge Canal was pumped from the Barge Canal bottom to the SYW-12 area and unsightly, black, odorous sludge banks were formed.

246.     Upon information and belief, material dredged from the Barge Canal was pumped from the Barge Canal and deposited on SYW-12 in many additional years.

247.     As a result of this pumping and deposition, contaminants present in the Barge Canal were transported directly to SYW-12.

248.     These contaminants include contaminants contributed to the Barge Canal by Sunoco's Oil City operations.

249.     Honeywell's investigations of SYW-12 have revealed stained soils with petroleum odors and oil sheen on groundwater.

250.     PAHs were detected in every surface soil sample collected at SYW-12.

251. In addition to PAHs, contaminants detected at SYW-12 include chlorinated benzenes, BTEX, carbon disulfide, 2-butanone, methylene chloride, acetone, PCBs (Aroclor 1254 and 1260), cadmium, copper, lead, mercury, zinc, nickel, chromium, beryllium, silver, and arsenic.

252. When compared against petrogenic and pyrogenic signatures, the PAHs present at SYW-12 suggest contributions from both petrogenic and pyrogenic sources, meaning a portion of the PAH contamination is from petroleum sources.

253. The location, concentrations, and forensic composition of PAHs in SYW-12 confirm that the Oil City operations are the predominant source of petrogenic PAHs at SYW-12.

254. Sunoco contributed a major portion of the Oil City petrogenic PAHs that came to rest in SYW-12.

255. Sunoco also likely contributed pyrogenic PAHs to SYW-12.

256. In addition, the location, concentrations, and/or forensic composition of BTEX and chlorinated benzene contaminants on SYW-12 suggests that the Oil City operations, including Sunoco's operations, are the source of at least some of these contaminants on SYW-12.

### *Procedural History/Prior Negotiations Regarding These Claims*

257. Sunoco entered a tolling agreement with Honeywell on December 22, 2009, and has agreed to toll the claims asserted herein until September 28, 2018.

258. The tolling agreement entered between Honeywell and Sunoco provides that the agreement is binding upon "their respective parent companies, subsidiaries, predecessors, successors, and assigns, including but not limited to Sun Company, Inc., and Sun Refining & Marketing Co."

259. Honeywell initially presented the full detail of these claims to Sunoco other Oil City companies in 2013.

260.    Despite five years of intensive negotiations, Sunoco has unreasonably minimized its liability, and the parties have failed to reach a settlement regarding these claims.

## COUNT ONE

## CERCLA COST RECOVERY CLAIM FOR SYW-12 RESPONSE COSTS

261.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

262.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part that:

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepted any hazardous substance for transport to . . . sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs . . . shall be liable for . . . any . . . necessary costs of response incurred by any other person consistent with the national contingency plan.

263.    Defendants and Honeywell are "persons" within the meaning of section 101(21),107(a), 113(f)(1), and 113(f)(3)(B) of CERCLA, 42 U.S.C. §§ 9601(21), 9607(a), 9613(f)(1), 9613(f)(3)(B).

264.    Defendants' Oil City properties, terminals, pipelines, barges, sewers, pipes and tributaries to Onondaga Lake, and Onondaga Lake are all "facilities" within the meaning of sections 101(9) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(9), 9607(a).

265.    Hazardous substances were "disposed" of at Defendants' facilities within the meaning of sections 101(14), 101(29), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), (29), 9607(a).

266.    There were "releases" and/or "threatened releases" of "hazardous substances" into the environment at and from the facilities, as those terms are defined in CERCLA sections 101(8), (9), (14), (22), and 107(a), 42 U.S.C. §§ 9601(8), (9), (14), (22), and 9607(a).

267.    At the time of the disposal and releases of hazardous substances, Defendants were "owners" and/or "operators" of one or more facilities, including their Oil City properties, terminals, and pipelines, within the meaning of section 101(20) and 107(a) of CERCLA, 42 U.S.C. § 9601(20), 9607(a).

268.    Defendants arranged for disposal of hazardous substances owned or possessed by Defendants and other parties at one or more facilities, including, but not limited to, Defendants' and others' Oil City properties, terminals, pipelines, sewers, pipes, and tributaries to Onondaga Lake, the Onondaga Lake Bottom Subsite, and SYW-12, within the meaning of section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

269.    Defendants' disposal and releases of these substances have contributed hazardous substances to SYW-12.

270.    Honeywell has incurred, and will continue to incur, "necessary costs of response . . . consistent with the national contingency plan" in the course of its investigation of SYW-12. 42 U.S.C. § 9607(a)(4)(B).  These costs were incurred voluntarily by Honeywell.

271.    Accordingly, Defendants are jointly and severally liable under Section 107 of CERCLA for the necessary costs of response incurred in investigating and remediating SYW-12.

272.    Section 113(g)(2) of CERCLA, 42 U.S.C § 9613(g)(2), provides that for cost recovery actions pursuant to Section 107, 42 U.S.C. § 9607, where future costs are anticipated, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

273.    Honeywell will continue to incur response costs in investigating the environmental contamination at SYW-12, and these costs are recoverable pursuant to section 107 of CERCLA, 42 U.S.C. § 9607.  A declaratory judgment is therefore appropriate defining Defendants as jointly and severally liable for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT TWO

## CERCLA CONTRIBUTION CLAIM FOR RESPONSE COSTS

274.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

275.    Disposal and releases of hazardous substances at Defendants' facilities during the time of Defendants' ownership have contributed hazardous substances to the Onondaga Lake Superfund Site and, more specifically, have contributed hazardous substances to the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12.

276.    Defendants transported hazardous substances for disposal in Onondaga Lake and on SYW-12, which locations were selected by Defendants and which disposal has contributed to the presence of hazardous substances in the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12.

277.    Defendants also arranged for the disposal of hazardous substances owned by Defendants in Onondaga Lake and on SYW-12, which has contributed to the presence of hazardous substances in the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12.

278.    Disposal and releases of hazardous substances from barges owned by certain Defendants during transport of such substances also contributed to the presence of hazardous substances in the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site.

279.    Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides in pertinent part that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 . . . or under section 9607(a)."

280.    Additionally, section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to [the] settlement."

281.    In the 2007 Consent Decree, Honeywell resolved its liability to the State of New York for some or all of the costs of the Onondaga Lake Bottom Subsite RI/FS and the ROD remedy, both of which constitute response actions within the meaning of CERCLA Section 101(2), 42 U.S.C. § 9601(25).

282.    The 2007 Consent Decree constitutes a judicially-approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

283.    Furthermore, all the costs Honeywell has incurred, and will incur, pursuant to the 2007 Consent Decree constitute necessary costs of response incurred consistent with the National Contingency Plan ("NCP") under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

284.    In the 2018 Response Costs Consent Decree, Honeywell resolved its liability to the United States for its costs incurred in overseeing the investigation and remediation of the

Onondaga Lake Bottom Subsite, which constitute response actions within the meaning of CERCLA.  42 U.S.C. § 9601(25).  The 2018 Response Costs Consent Decree constitutes a judicially-approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

285.    Furthermore, all the costs Honeywell has incurred pursuant to the 2018 Response Costs Consent Decree constitute necessary costs of response incurred consistent with, and not inconsistent with, the NCP under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

286.    Defendants are liable under Section 107 of CERCLA for the necessary costs of response incurred in investigating and remediating the Onondaga Lake Bottom Subsite and in investigating SYW-12.

287.    Defendants were not party to the 2007 Consent Decree nor the 2018 Response Costs Consent Decree.

288.    Accordingly, Defendants are liable to Honeywell under Section 113 of CERCLA for an equitable share of the necessary costs of response incurred by Honeywell, consistent with the NCP, with regard to the Onondaga Lake Bottom Subsite and SYW-12, including costs incurred pursuant to the 2007 Consent Decree and the 2018 Response Costs Consent Decree.

289.    The federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

290.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake.  Honeywell will continue

to incur costs pursuant to the 2007 Consent Decree and in the investigation of SYW-12.  A declaratory judgment is therefore appropriate defining Defendants' liability for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT THREE

## CERCLA CONTRIBUTION CLAIM FOR NRD COSTS

291.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

292.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable "for . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

293.    Defendants' disposals and releases have contributed hazardous substances that caused injury to, destruction of, or loss of natural resources at the Onondaga Lake Superfund Site.

294.    In the 2018 NRD Consent Decree, Honeywell resolved its liability to the Onondaga Lake Trustees for some or all of the NRD at the Onondaga Lake Superfund Site.  The 2018 NRD Consent Decree constitutes a judicially-approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).  Furthermore, the costs Honeywell has incurred, and will incur, pursuant to the 2018 NRD Consent Decree constitute payment for NRD costs under section 107(a)(4)(c) of CERCLA, 42 U.S.C. § 9607(a)(4)(C).

295.    Defendants are liable under Section 107 of CERCLA, 42 U.S.C. § 9607, for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs

of assessing such injury, destruction, or loss, resulting from the releases of hazardous substances at or from defendants' facilities at the Onondaga Lake Superfund Site.

296.    Defendant were not party to the 2018 NRD Consent Decree.

297.    Accordingly, Defendants are liable to Honeywell under section 113 of CERCLA, 42 U.S.C. § 9613, for an equitable share of the costs incurred by Honeywell pursuant to the 2018 NRD Consent Decree.

298.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred in connection with the 2018 NRD Consent Decree.  Honeywell will also continue to incur NRD costs in connection with the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover NRD costs against Defendants.

**COUNT FOUR**

**OPA CONTRIBUTION CLAIM**

299.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

300.    Section 1002 of OPA, 33 U.S.C. § 2702, provides in pertinent part, as follows:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for . . . any removal costs incurred by any person . . . which are consistent with the National Contingency Plan . . . [and] [d]amages for injury to, destruction of, loss of, loss of use of, natural resources, including the reasonable costs of assessing the damage.

301.    Honeywell is a "person" within the meaning of sections 1001(27), 1002, and 1009 of OPA, 33 U.S.C. §§ 2701(27), 2702, 2709.

302.     Honeywell has incurred removal costs consistent with the NCP, as defined by section 1001(19) of OPA, 33 U.S.C. § 2701(19), and NRD costs at the Onondaga Lake Superfund Site, including the Onondaga Lake Bottom Subsite and SYW-12.

303.     The Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12 include navigable waters and adjoining shorelines, as defined in section 1001(21) of OPA, 33 U.S.C. § 2701(21).

304.     Defendants are responsible parties, as defined in section 1001(32) of OPA, 33 U.S.C. § 2701(32).

305.     Defendants owned or operated "facilities" from which oil was "discharged" into the Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12, within the meaning of sections 1001(9) and 1002 of OPA, 33 U.S.C. §§ 2701(9), 2702.

306.     Certain Defendants also owned and operated "vessels" from which oil was discharged into the Onondaga Lake Bottom Subsite, within the meaning of sections 1001(9) and 1002 of OPA, 33 U.S.C. §§ 2701(9), 2702.

307.     Defendants' discharges and releases of oil resulted in injury to, destruction of, loss of, and/or loss of use of natural resources.

308.     Defendants are liable in contribution to Honeywell under sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709, 2717, for oil-related removal costs incurred consistent with the NCP, and not inconsistent with the NCP, at the Onondaga Lake Bottom Subsite and SYW-12.

309.     Defendants are liable in contribution to Honeywell under sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709, 2717, for damages for injury to, or economic losses resulting from destruction of, loss of, and/or loss of use of natural resources, including the reasonable costs of assessing the damage.

310.     An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at the Onondaga Lake Superfund Site and SYW-12 and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at the Onondaga Lake Bottom Subsite.  Honeywell will also continue to incur response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur costs pursuant to the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT FIVE

## NEW YORK NAVIGATION LAW CONTRIBUTION CLAIM

311.     Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

312.     Section 181(1) of the New York Navigation Law ("Act"), N.Y. Nav. Law § 181(1), provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained."

313.     Defendants are "persons" who "discharged" "petroleum," as those terms are defined by N.Y. Nav. Law §§ 172(14), (8), and (15), at the Onondaga Lake Bottom Subsite and SYW-12.

314.    Defendants' "petroleum" "discharges" at Onondaga Lake and SYW-12 were into the waters of the State of New York and/or onto lands from which the discharges might flow or drain into those waters.

315.    Defendants' petroleum discharges caused direct and indirect damages to the natural resources of Onondaga Lake.

316.    A portion of the costs Honeywell has incurred and will incur pursuant to the 2018 NRD Consent Decree are direct or indirect damages caused by Defendants' petroleum discharges.

317.    Section 176(8) of the Act, N.Y. Nav. Law § 176(8), provides that "every person providing cleanup, removal of discharge of petroleum . . . pursuant to this section [of the Act] shall be entitled to contribution from any other responsible party."

318.    Section 181(2) of the Act, N.Y. Nav. Law § 181(2), defines "cleanup and removal costs" to include "[t]he cost of restoration and replacement, where possible, of any natural resource damaged or destroyed by a discharge."

319.    Defendants are "responsible parties" under N.Y. Nav. Law § 176(8) with regard to the petroleum discharges at Oil City.

320.    Honeywell is a "person" that has incurred, and will continue to incur, "cleanup and removal" costs, as that phrase is defined by N.Y. Nav. Law § 172(5), at the Onondaga Lake Bottom Subsite and SYW-12, which were undertaken with the approval of DEC.

321.    Honeywell's actions related to the "cleanup and removal" of "petroleum" at the Onondaga Lake Bottom Subsite and SYW-12 have been in accordance with the NCP, codified at 40 C.F.R. Part 300, and as required by N.Y. Nav. Law § 176(4).

322.     Defendants are liable to Honeywell for contribution of the costs of cleanup and removal of petroleum discharges that Honeywell has incurred, and will continue to incur, with respect to the investigation and remediation of the Onondaga Lake Bottom Subsite and the investigation of SYW-12.

323.     Defendants are liable to Honeywell for contribution of NRD costs incurred pursuant to the 2018 NRD Consent Decree.

324.     An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake, SYW-12, and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at Onondaga Lake.  Honeywell will also continue to incur substantial response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur substantial costs in connection with the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against Defendants.

## COUNT SIX

## STATE LAW CONTRIBUTION CLAIM

325.     Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

326.     Section 1401 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 1401, and common law provide that if two or more persons are subject to liability for damages or

costs for the same injury, one person may claim contribution from the other for any damages or costs incurred by that person in excess of his or her equitable share.

327.    Honeywell and Defendants are all liable for contamination at Onondaga Lake that has resulted in and will result in the incurrence of costs by Honeywell pursuant to the 2007 Consent Decree, the 2018 Response Costs Consent Decree, the 2018 NRD Consent Decree, and in the investigation of SYW-12.

328.    As a direct and proximate result of the acts and/or omissions of Defendants, Honeywell has incurred, and will incur in the future, costs pursuant to the 2007 Consent Decree, the 2018 Response Costs Consent Decree, the 2018 NRD Consent Decree, and the investigation of SYW-12, in excess of its equitable share.

329.    An actual controversy currently exists between Honeywell and Defendants with regard to Defendants' liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake, SYW-12, and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at Onondaga Lake.  Honeywell will also continue to incur substantial response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur substantial costs pursuant to the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining Defendants' liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs and costs incurred in connection with the 2018 NRD Consent Decree against Defendants.

## RELIEF REQUESTED

330.    WHEREFORE, Honeywell requests judgment in its favor,

331.    Declaring Defendants, pursuant to section 107(a) of CERCLA, 42 U.S.C. §

9607(a), to be jointly and severally liable for response, removal, and/or cleanup costs incurred or

to be incurred by Honeywell with respect to the investigation of environmental contamination at

SYW-12, plus interest and costs, attorneys' fees, and such other relief as the Court may deem

appropriate and just.

332.    Ordering Defendants, pursuant to section 113(f) of CERCLA, 42 U.S.C. §

9613(f), Sections 1002, 1009, and 1017 of OPA, 33 U.S.C. §§ 2702, 2709, 2717, N.Y. Nav. Law

§ 176(8), N.Y. C.P.L.R. § 1401, and/or common law, to contribute their equitable share of

response, removal, and/or cleanup costs incurred or to be incurred by Honeywell with respect to

the investigation and remediation of environmental contamination at the Onondaga Lake Bottom

Subsite and SYW-12, plus interest and costs, attorneys' fees, and such other relief as the Court

may deem appropriate and just.

333.    Entering a declaratory judgment, which will be binding in any subsequent action

or actions that Honeywell may bring to recover response, removal, and/or cleanup costs against

Defendants, that Defendants are liable for their equitable share of response costs that Honeywell

may incur in the investigation and cleanup of environmental contamination at the Onondaga

Lake Bottom Subsite and SYW-12.

334.    Ordering Defendants, pursuant to section 113(f) of CERCLA, 42 U.S.C. §

9613(f), Sections 1002, 1009, and 1017 of OPA, 33 U.S.C. §§ 2702, 2709, 2717, N.Y. Nav. Law

§ 176(8), N.Y. C.P.L.R. § 1401, and/or common law, contribute their equitable share of NRD

costs incurred or to be incurred by Honeywell pursuant to the 2018 NRD Consent Decree, plus

interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and

just.

335.    Entering a declaratory judgment, which will be binding in any subsequent action or actions that Honeywell may bring to recover costs incurred pursuant to the 2018 NRD Consent Decree against Defendants, that Defendants are liable for their equitable share of NRD costs that Honeywell may incur pursuant to the 2018 NRD Consent Decree.

## DEMAND FOR JURY TRIAL

336.    Honeywell hereby demands trial by jury of any and all issues so triable.

Dated: September 28, 2018

ARNOLD & PORTER KAYE SCHOLER LLP

Of Counsel:                                    By:    /s/ *Brian D. Israel*

Brian D. Israel, NDNY Bar No.: 514704
Lauren Daniel, NDNY Bar No.: 700114
Geoffrey Michael, NDNY Bar No.: 518110
Andrea Broach, NDNY Bar No.: 518158
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone:  202.942.6546
Facsimile:  202.942.5999
email:  brian.israel@arnoldporter.com

*Attorneys for Honeywell International Inc.*